**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **YOUNG AMERICA'S FOUNDATION,**<br><br>     **Plaintiff,**<br><br>          v.<br><br>**ROBERT M. GATES, Secretary, United States Department of Defense,**<br><br><br>     **Defendant.** | **Civil Action No.  07-01351 (JDB)** |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Young America's Foundation ("YAF") seeks to compel the Secretary of Defense to terminate federal funding for the University of California, Santa Cruz ("UCSC").  YAF alleges that UCSC is in violation of the Solomon Amendment, 10 U.S.C. § 983, which provides that institutions of higher education must accommodate military recruiters by affording equal access to campuses and students as compared to any other employer.  The penalty for failing to furnish such equal access is the forfeiture of certain federal funds.  Notwithstanding UCSC's alleged non-compliance with the Solomon Amendment, YAF claims that the Secretary of Defense has unlawfully refused to perform his statutory duty to cut off UCSC's federal funding.  Hence, YAF seeks to compel the Secretary to do precisely that.  For his part, the Secretary has moved to dismiss the complaint, arguing that the Court lacks subject matter jurisdiction over this dispute and that YAF does not have standing to bring this lawsuit.  That motion is now fully briefed and ripe for resolution.  Upon careful consideration, and for the reasons identified below, the Court will grant the Secretary's motion to dismiss.

-1-

## BACKGROUND

The underlying facts of this case are not seriously in dispute. In protest over the government's policy concerning homosexuals serving in the military, many institutions of higher education began either to restrict, or to eliminate altogether, the capacity of military officials to recruit students on campus to join the Armed Forces. See Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 51 (2006) (hereinafter "FAIR"). To combat those restrictive policies, Congress enacted the Solomon Amendment. That provision "specifies that if any part of an institution of higher education denies military recruiters access equal to that provided other recruiters, the entire institution [will] lose certain federal funds." Id. Specifically, the Solomon Amendment provides:

> No funds . . . may be provided by contract or by grant to an institution of higher education (including any subelement of such institution) if the Secretary of Defense determines that the institution (or any subelement of that institution) has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents -- (1) the Secretary of a military department or Secretary of Homeland Security from gaining access to campuses, or access to students . . . on campuses, for purposes of military recruiting in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer.

See 10 U.S.C. § 983(b). As the Supreme Court put it, "[t]he Solomon Amendment gives universities a choice: Either allow military recruiters the same access to students afforded by any other recruiter or forgo certain federal funds." See FAIR, 547 U.S. at 58. The Department of Defense ("DOD") has published implementing regulations that, among other things, require the Secretaries of the Military Departments to "[i]dentify covered schools that, by policy or practice, deny military recruiting personnel entry to the campus(es) of those schools, access to their students, or access to student recruiting," see 32 C.F.R. § 216.5(b)(1), and to disseminate a list of

-2-

all such schools to federal agencies to ensure that those ineligible institutions do not receive certain federal funds, see id. § 216.5(a)(1)(ii).

YAF is a "nonprofit organization committed to ensuring that young Americans understand and are inspired by the importance of a strong national defense." See Am. Compl. ¶ 3.  The foundation has "approximately 209,094 students, alumni and supporters nationwide." Id. ¶ 4.  Of greater significance to this case, YAF purports to have thirteen student members who are currently enrolled at UCSC.

According to YAF, UCSC -- a public university located in Santa Cruz, California -- "received approximately $80 million in federal funds in 2005 and continues to receive tens of millions of dollars in federal funds annually." Id. ¶ 9.  Beginning in April 2005, UCSC hosted a series of job fairs open to its student body.  On April 5, 2005, for instance, the university held a job fair that included, among other employers, military recruiters from the U.S. Marine Corps. Id. ¶ 10.  Those recruiters were met by "approximately 200 faculty and student protesters" who accosted the Marine Corps recruiters by "shouting, banging on windows, and demanding that the military recruiters leave campus." Id.  After enduring these protests for nearly an hour, the "military recruiters vacated their posts and fled the job fair." Id.  Notably, YAF maintains that at least one of its student members attended the April 5th job fair "seeking to meet with military recruiters," id. ¶ 13, but those hopes were thwarted by the actions of the protesters.

A similar occurrence took place on October 18, 2005.  UCSC held another job fair on that date and the military recruiters who were present once again faced "[h]undreds of faculty and student protesters." Id. ¶ 15.  Those protesters "marched and rallied . . . [and] were able to block access to military recruiters at the job fair." Id.  YAF again insists that at least one of its student

members also attended this job fair hoping to meet with military recruiters and was unable to do so. Id. ¶ 17. Finally, on April 11, 2006, UCSC hosted yet another job fair with recruiters from the U.S. Army and U.S. National Guard in attendance. Id. ¶ 19. Once again, the military recruiters met resistance from student and faculty protesters. On this occasion, the protesters succeeded in "block[ing] the entrance to the job fair for all students." Id. In response, the "military recruiters departed from the job fair due to the unsafe environment for them and UCSC students created by the protesters." Id. As before, YAF alleges that one of its student members had attended the April 11th job fair "seeking to meet with military recruiters," id. ¶ 21, but was unable to do so due to the protesters' activities.

On April 12, 2006, counsel for YAF wrote to then-Secretary of Defense Donald Rumsfeld "advising him of the failure of UCSC to provide access required by the Solomon Amendment . . . and urging [him] to withold the applicable federal funds from UCSC for its violation of the Solomon Amendment." Id. ¶ 23. YAF never received a response to its letter. UCSC allegedly canceled a job fair scheduled for January 31, 2007 "due to safety concerns associated with UCSC protesters who planned to oppose the presence of military recruiters on the UCSC campus." Id. ¶ 24. Similarly, military recruiters from the U.S. Army and U.S. Marine Corps decided to withdraw from another job fair at UCSC scheduled for April 24, 2007. Id. ¶ 25. Military officials had learned that student government leaders had alerted the UCSC administration that a "large faculty and student protest was imminent due to the presence of military recruiters and that [the] protest would impair students' access to the job fair." Id. In response, the military recruiters decided to forgo attending the job fair altogether.

YAF contends that UCSC "has given tacit approval to the actions of its faculty and students

because it has failed to prevent the disruptive and sometimes violent anti-military protests." Id. ¶ 27. Moreover, in YAF's view, UCSC has "done nothing to insure that military recruiters can safely attend on-campus job fairs . . . and it has done nothing to insure that military recruiters can meet with UCSC students attending UCSC job fairs." Id. Perhaps unbeknownst to YAF when it filed this lawsuit, however, UCSC in fact "has an established written policy permitting equal access to military recruiters." See Def.'s Renewed Mot. to Dismiss (hereinafter "Def.'s Mot.") at 8 (citing http://www.ucop.edu/raohome/cgmemos/94-09.html.). Notwithstanding that formal policy, however, YAF contends that UCSC has "a policy and/or practice that prohibits or, in effect, prevents military recruiters from gaining access to campus and/or access to students that is, at least, equal in quality and scope to the access UCSC provides to non-military employers." Am. Compl. ¶ 30. And that policy or practice, YAF maintains, renders UCSC in violation of the Solomon Amendment. YAF therefore seeks a writ of mandamus directing the Secretary of Defense to find that UCSC is not in compliance with the Solomon Amendment and, consequently, to terminate federal funding to the university. Alternatively, YAF seeks review under the APA, arguing that the Secretary's refusal to cut off federal funding to UCSC in the face of its supposedly patent violation of the Solomon Amendment constitutes agency action unreasonably delayed or withheld. Thus, YAF asks the Court to "compel agency action that [has been] unlawfully withheld or unreasonably delayed," pursuant to the APA. Id. ¶ 52.

## STANDARD OF REVIEW

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court -- plaintiff here -- bears the burden of establishing that the court has jurisdiction. See US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000) (citing Steel Co. v. Citizens for a Better Env't, 523

U.S. 83, 103-04 (1998)); see also Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp.
2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1) motion imposes on the court an affirmative obligation
to ensure that it is acting within the scope of its jurisdictional authority."); Pitney Bowes, Inc. v. U.S.
Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  Although a court must accept as true all the
factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule
12(b)(1), Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163,
164 (1993), "'plaintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in
resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand
Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal
Practice and Procedure § 1350 (2d ed. 1990)).  At the stage of litigation when dismissal is sought,
a plaintiff's complaint must be construed liberally, and the plaintiff should receive the benefit of all
favorable inferences that can be drawn from the alleged facts.  See EEOC v. St. Francis Xavier
Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  Additionally, a court may consider material
other than the allegations of the complaint in determining whether it has jurisdiction to hear the case,
as long as it still accepts the factual allegations in the complaint as true.  See Jerome Stevens Pharm.
Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); St. Francis Xavier Parochial Sch., 117 F.3d
at 624-25 n.3; Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir.1992); Haase v. Sessions,
835 F.2d 902, 906 (D.C. Cir. 1987); Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986).

## DISCUSSION

The Secretary's motion to dismiss is premised upon two distinct theories that he believes
warrant dismissal in their own right.  First, the Secretary argues that an agency's decision to
undertake -- or not to undertake -- enforcement action under the Solomon Amendment is

committed to agency discretion by law and, therefore, judicial review of that decision is unavailable.  See 5 U.S.C. § 701(a)(2).  Alternatively, the Secretary contends that YAF lacks Article III standing to bring this suit.  As explained below, the Secretary is correct on both counts.

### I.    Subject Matter Jurisdiction Under the Administrative Procedure Act

As a general matter, the APA provides for judicial review of final agency action.  See 5 U.S.C. § 702.  The APA defines "agency action" to include an agency's "failure to act."  See 5 U.S.C. § 551(13).  Thus, a reviewing court is authorized to "compel agency action unlawfully withheld or unreasonably delayed" in certain circumstances.  See 5 U.S.C. § 706(1).  Notably, however, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004) (emphasis in original).  In addition, there are two other important limitations placed upon the judiciary's capacity to examine agency actions.  Judicial review is not available if "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  See 5 U.S.C. § 702(a)(1) - (2).  In this case, the Secretary contends that "enforcement decisions involve questions of unfettered prosecutorial discretion" that are committed to agency discretion by law, and therefore "Section 701(a)(2) applies and expressly precludes judicial review."  See Def.'s Mot. at 3.  The Court agrees.

The Supreme Court has firmly stated that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  In Chaney, the Court noted that "[t]his recognition of the existence of discretion is attributable in no small part

to the general unsuitability for judicial review of agency decisions to refuse enforcement." Id.

Enforcement decisions, the Court stated, often:

> involve[] a complicated balancing of a number of factors which are peculiarly within
> [an agency's] expertise.  Thus, the agency must not only assess whether a violation
> has occurred, but whether agency resources are best spent on this violation or
> another, whether the agency is likely to succeed if it acts, whether the particular
> enforcement action requested best fits the agency's overall policies, and, indeed,
> whether the agency has enough resources to undertake the action at all.  An agency
> generally cannot act against each technical violation of the statute it is charged with
> enforcing.  The agency is far better equipped than the courts to deal with the many
> variables involved in the proper ordering of its priorities.

Id. at 831-32.  Thus, an agency's enforcement decisions are "presumptively unreviewable," but

that "presumption may be rebutted where the substantive statute has provided guidelines for the

agency to follow in exercising its enforcement powers." Id. at 832-33.  Congress "may limit an

agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by

otherwise circumscribing an agency's power to discriminate among issues or cases it will

pursue." Id. at 833.  Consequently, courts must look to the enabling statute to determine whether

"Congress has provided . . . 'law to apply.'" Id. at 834.  If so, "courts may require that the agency

follow that law; if . . . not, then an agency refusal to institute proceedings is a decision

'committed to agency discretion by law' within the meaning of [Section 701(a)(2)]." Id. at 834-

35.

Here, YAF challenges DOD's decision not to initiate enforcement proceedings against

UCSC.  Thus, as explained in Chaney, the initial question is whether the Solomon Amendment

provides any "law to apply" to which this Court may compel DOD to adhere in exercising its

enforcement discretion.  YAF insists that "Congress has created a roadmap to guide judicial

interpretation of the Solomon Amendment." See Pl.'s Opp'n at 5.  In particular, YAF contends

that the statute's text, which provides that "no funds . . . may be provided" to an institution that is found to be in non-compliance with the Solomon Amendment, see Pl.'s Opp'n at 5-6, contains the sort of "substantive legal criteria against which an agency's conduct can be seriously evaluated." See Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002). YAF is mistaken. Congress's direction that "no funds" may be provided to ineligible institutions merely supplies the remedy that DOD is instructed to apply if the agency determines that any particular university is not in compliance with the substantive components of the Solomon Amendment. That language does not, however, "provide[] guidelines for the agency to follow in exercising its enforcement powers." Chaney, 470 U.S. at 833. Specifically, the statutory text indicates only that "[n]o funds . . . may be provided . . . if the Secretary of Defense determines that the institution" has an infringing policy or practice. See 10 U.S.C. § 983(a) (emphasis added). But the "no funds" command does not guide the Secretary's determination of non-compliance (or compliance) in any material respect. In short, that language does not limit or circumscribe the Secretary's discretion in exercising its enforcement authority.

Similarly, YAF's reliance upon the "at least equal in quality and scope" language found in the statutory text is also misplaced. As the Secretary correctly notes, that is a "substantive provision[] only" that does not "purport to direct the Secretary when to undertake an enforcement action." See Def.'s Mot. at 7. Put another way, the "at least equal in quality and scope" provision does in fact aid the Secretary's determination of non-compliance, but it does not guide, restrict, or otherwise circumscribe the Secretary's general discretion as to whether, and if so when, to initiate any enforcement mechanism against a particular educational institution in the first instance.

Contrary to YAF's assertions, the Solomon Amendment's implementing regulations also do not limit the Secretary's discretion to decline to initiate enforcement procedures.[1]  To be sure, the regulations at issue do contain some guidance concerning how DOD typically proceeds with respect to the Solomon Amendment.  For instance, the regulations indicate that the Secretaries of the Military Departments shall identify schools that "by policy or practice, deny military recruiting personnel entry to the campus(es) of those schools, access to their students, or access to student recruiting information."  See 32 C.F.R. § 216.5(b)(1).  And once those schools are identified, the regulations require the Military Service to "seek written confirmation of the school's present policy from the head of the school through a letter of inquiry."  Id. § 216.5(b)(1)(i).  Upon receipt of a response to such a letter of inquiry, DOD will "[e]valuate the responses" to determine whether the institution is violating the Solomon Amendment and, if so, notify "any affected school of that determination along with the basis . . . [and also notify the school] that it is therefore ineligible to receive prescribed funds as a result of that determination." Id. § 216.5(a)(1)(I), (b)(3).

It is evident, then, that the implementing regulations describe and outline the information-gathering process that DOD engages in with respect to a Solomon Amendment investigation.  But they do not circumscribe the Secretary's discretion concerning whether to undertake ultimate enforcement action.  The final decision to find a school in violation in any particular instance and to institute appropriate enforcement measures lies entirely within the discretion of the Secretary and the Military Service.  Indeed, the regulations merely direct the agency to "[m]ake a final

---

[1] The D.C. Circuit has held that "[j]udicially manageable standards may be found in formal or informal policy statements and regulations as well as in statutes."  Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987).

determination" pursuant to the Solomon Amendment; they do not require the agency to take any specific criteria into consideration in reaching that determination. See 32 C.F.R. § 2126.5(a)(1)(i). Instead, that decision is left to the Secretary's discretion. The Secretary, for instance, is free to determine -- upon review of an institution's response to a letter of inquiry -- that an institution that may have initially appeared to be restricting access to military recruiters is not in fact violating the Solomon Amendment. The retention of that discretion indicates that the agency has not bound itself to any restrictions on its general freedom to initiate (or not to initiate) enforcement action. See Padula, 822 F.2d at 100 ("We also examine whether the agency's statement leaves the agency free to exercise its discretion. Pronouncements that impose no significant restraints on the agency's discretion are not regarded as binding norms.").

The facts of this case are illustrative of the DOD's discretion. As the Secretary correctly points out, the "regulations are silent about what enforcement actions must be undertaken when, despite a written policy [permitting military recruiters equal access], student and faculty protests nonetheless allegedly prevent recruiter access." See Def.'s Mot. at 8. The Secretary could reasonably conclude that such instances should fall to the bottom of the agency's enforcement priorities if, indeed, the school is violating the Solomon Amendment at all.[2] In any event, the

---

[2] Indeed, in FAIR the Supreme Court indicated that "[l]aw schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds." 547 U.S. at 60. Moreover, the Court cited to the Solicitor General's concession at oral argument that law schools could even "help organize student protests." Id. Thus, the Supreme Court appears to have contemplated that educational institutions would be permitted to participate actively in student protests concerning military recruiters. In this case, there is no evidence that UCSC helped to organize the student and faculty protests; to the contrary, the school appears to have invited military recruiters to participate in the job fairs notwithstanding student displeasure over that decision. It is difficult to see how merely permitting a student protest to occur -- particularly in light of the First Amendment concerns involved -- would run afoul of the Solomon Amendment

Supreme Court made clear in Chaney that such decisions rest firmly within the discretion of the agency, see 470 U.S. at 831-32 ("An agency cannot act against each technical violation of the statute it is charged with enforcing.  The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of priorities."), and there is no indication here that Congress has circumscribed that enforcement discretion in any significant way.

Nor does the use of the term "shall" in the implementing regulations demonstrate that the agency has voluntarily limited its enforcement discretion in the manner suggested by YAF.[3]  It is true that "[j]ust as Congress can provide the basis for judicial review of nonenforcement decisions by spelling out statutory factors to be measured by the courts, so an agency can provide such factors by regulation."  Center for Auto Safety v. Dole, 846 F.2d 1532, 1534 (D.C. Cir. 1998).  But DOD has not done so here.  In effect, YAF argues that the word "shall" in the implementing regulations -- see 32 C.F.R. § 216.5(a)-(c) -- indicates that the agency has opted to forgo its enforcement discretion and has bound itself to act in certain circumstances.  But the

given the Supreme Court's apparent belief that an educational institution could go as far as to help to organize a protest without fear of losing federal funding.

[3] Two of the principal cases cited by YAF in support of its position are distinguishable from the present dispute.  To begin with, the D.C. Circuit's opinion in Padula actually supports the result here.  There, the court found that the "more than a dozen FBI letters to law schools" that indicated that the Bureau would not "improperly discriminate against any applicant" in hiring decisions nevertheless did not "cabin[] the FBI's traditional hiring discretion" with respect to giving particular scrutiny to a homosexual candidate's employment application.  Padula, 822 F.2d at 101.  Similarly, DOD's implementing regulations do not circumscribe the agency's traditional prosecutorial discretion here.  Moreover, Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs, 515 F. Supp. 2d 1 (D.D.C. 2007), also cited by YAF, is not on point.  There, the court explicitly noted that the agency decision at issue was "very different from a decision not to enforce or prosecute . . . [because it] does not involve . . . the difficult decisions regarding manpower and allocation of resources that inform enforcement decisions and give rise to the hesitancy to undertake judicial review."  Id. at 8.  Thus, by its own terms, Alliance to Save the Mattaponi does not apply to the type of enforcement decision at issue in this case.

Supreme Court rejected a very similar argument in <u>Chaney</u>.  There, the statute provided that "any person who violates the Act's substantive prohibitions 'shall be imprisoned . . . or fined.'" <u>Chaney</u>, 470 U.S. at 835.  The plaintiffs argued that the quoted language "mandates criminal prosecution of every violation of the Act," thereby eliminating the agency's discretion to set enforcement priorities.  <u>Id.</u>  The Court brushed aside that argument, noting that it was "unwilling to attribute such a sweeping meaning to [that] language."  <u>Id.</u>  Rather, the Act's "enforcement provisions . . . commit complete discretion to the Secretary to decide how and when they should be exercised."  <u>Id.</u>  The same goes for the implementing regulations at issue here.  Indeed, in <u>Chaney</u> the agency's pertinent policy statement noted that the agency considered itself "'obligated' to take certain investigative actions" when confronted by particular circumstances. <u>Id.</u> at 836.  Nevertheless, the Supreme Court found that even that powerful statement was not sufficient to "override" the typical presumption that enforcement actions are committed to agency discretion by law.  <u>Id.</u>  The implementing regulations at issue in this case do not contain any language nearly as strong as the "obligation" statement in <u>Chaney</u>, which further supports the conclusion that DOD has not limited its own prosecutorial discretion.

<u>Sierra Club v. Thomas</u>, 828 F.2d 783 (D.C. Cir. 1987), is also of no aid to YAF.  As YAF would have it, the Secretary's unwillingness to initiate enforcement proceedings is the type of "agency inaction" that may be reviewed under <u>Sierra Club</u>, <u>id.</u> at 793 ("[W]e also have jurisdiction to review agency inaction.").  The Secretary's failure to act here, YAF argues, "has affected YAF no differently than if [the Secretary] had found that USCS [sic] is <u>not</u> in violation of the Solomon Amendment."  <u>See</u> Pl.'s Opp'n at 8.  But <u>Sierra Club</u> does not stand for the proposition that YAF assigns to it.  As the Supreme Court has made clear, "[a] 'failure' to act is

-13-

not the same thing as a 'denial.'" <u>See</u> <u>Norton</u>, 542 U.S. at 63.  An action to compel agency action unlawfully withheld pursuant to § 706(1) of the APA "can proceed only where a plaintiff asserts that an agency failed to take a <u>discrete</u> agency action that it is <u>required to take</u>."  <u>Id.</u> at 64 (emphasis in original).  Drawing from the Attorney General's Manual on the APA, the Supreme Court concluded in <u>Norton</u> that § 706(1) "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing <u>how</u> it shall act.'" <u>Id.</u> (citing Attorney General's Manual on the Administrative Procedure Act 108 (1947)).

As described above, however, an agency's decision to take enforcement action ordinarily lies within its total discretion.  Thus, it is improper to employ § 706(1) to compel DOD to launch enforcement proceedings against UCSC because prosecutorial choices are not ministerial or non-discretionary acts; to the contrary, they are inherently discretionary.  Put another way, DOD is not "required" to take enforcement steps against YAF for purposes of § 706(1).  Moreover, YAF seeks to compel DOD to terminate federal funding for UCSC; in that sense, YAF also impermissibly aims to direct "how" the agency should act, which further runs afoul of the Supreme Court's direction in <u>Norton</u>.

In sum, YAF has not overcome the normal presumption that an agency's decision to initiate or not to initiate enforcement proceedings is not subject to judicial review.  Neither the statute nor the implementing regulations, which merely outline the process that DOD follows to investigate potential Solomon Amendment violations, limits DOD's traditional discretion in this area.  Consequently, this action is barred by § 701(a)(2) because the Secretary's decisions regarding initiating enforcement actions are committed to agency discretion by law, and hence

-14-

the Court will grant the Secretary's motion to dismiss.

## II.    Article III Standing

Even assuming that YAF's lawsuit were not precluded by the APA, it should nevertheless be dismissed for lack of standing. Standing, of course, "'is an essential and unchanging' predicate to any exercise of . . . jurisdiction" by an Article III court. See Am. Chemistry Council v. Dep't of Transp., 468 F.3d 810, 814 (D.C. Cir. 2006) (quoting Florida Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)). "[T]he irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." Id. (internal quotations and citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." Id. (internal quotations and alterations omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (internal quotations omitted). An association, such as YAF, has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Am. Chemistry Council, 468 F.3d at 815.

As an initial matter, to establish associational standing YAF bears the burden of demonstrating that at least one of its members would have standing to bring suit in his or her own

capacity. Thus, YAF must prove that one of its members at UCSC (1) has the requisite injury-in-fact and (2) can illustrate an appropriate causal connection between that injury and actions taken by the Secretary, and (3) that the relief requested by YAF here would redress that member's injury. See Defenders of Wildlife, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing these elements."). In this case, it is not necessary to proceed beyond this threshold step of the associational standing inquiry because YAF has not satisfactorily shown that any of its members at UCSC would have standing to bring this lawsuit in their personal capacities.

a. <em>Injury-in-Fact</em>

As explained above, a plaintiff must incur an actual or imminent injury that is concrete and particularized in order to satisfy the injury-in-fact requirement. To that end, YAF has submitted a declaration by Flagg Youngblood, the Director of Military Outreach at YAF. See Pl.'s Opp'n Youngblood Decl. ¶ 1. Mr. Youngblood states that "[a]pproximately six of YAF's students at UCSC have considered or are considering a career with the military." Id. ¶ 7. Moreover, "[a]t least one of YAF's students attended [the April 5, 2005] job fair seeking to meet with military recruiters," who were scheduled to be at the event. Id. ¶¶ 8-10. However, due to the "[l]arge-scale protests" that "blocked access to military recruiters who were at the job fair . . . [n]o YAF students were able [to] meet with military recruiters at the April 5, 2005 job fair." Id. ¶¶ 11-12. Mr. Youngblood also maintains that the same thing happened to "[a]t least one of YAF's students" who attempted to attend the October 18, 2005 job fair. Id. ¶¶ 13-17. Finally, at "least one of YAF's students sought to attend UCSC's January 31, 2007 job fair" to meet with military recruiters but was unable to do so because the job fair was canceled due to a scheduled

-16-

student and faculty protest.  Id. ¶ 18.  In total, "YAF's students have not been able to meet with military recruiters at a UCSC job fair in approximately two and a half years."  Id. ¶ 22.  That, according to YAF, represents a cognizable injury-in-fact because the students -- some of whom are interested in pursuing military careers -- have been deprived of the opportunity to meet with military recruiters at these school-sanctioned events.  Presumably, the injury suffered by those students is that the possibility of prospective employment with the military has been somehow impaired by their inability to meet with recruiters at those job fairs.  It is also conceivable that the students have been injured in some capacity by the loss of the opportunity to learn more about available career opportunities with the military.

The Secretary does not directly take issue with the sufficiency of those asserted injuries. Instead, the Secretary contests the form of those assertions.  Specifically, he argues that YAF has failed "to identify by name any UCSC students it purports to represent, and explain each student's individualized harm."  Def.'s Mot. at 11 (emphasis added).  The Secretary insists that "general, conclusory allegations about its membership and . . . students" cannot satisfy YAF's burden to demonstrate an injury-in-fact under the established case law of this Circuit.  In support of that assertion, the Secretary cites to Am. Chemistry Council, which held that "an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact."  468 F.3d at 820.  Thus, to carry its burden, the Secretary insists that YAF must identify at least one of the supposedly injured students by name.

In response, YAF argues that it is "not required to reveal its membership list."  Pl.'s Sur-reply at 3.  It cites to the district court opinion in FAIR, which held that an organization "need not reveal its membership list at the pleading stage in order to bring suit on its members' behalf."

FAIR v. Rumsfeld, 291 F. Supp. 2d 269, 287 (D.N.J. 2003). Instead, the court found that "'it is enough for the representative entity to allege that one of its members or constituents has suffered an injury that would allow it to bring suit in its own right.'" Id. (quoting Doe v. Stincer, 175 F.3d 879, 885 (11th Cir. 1999)).[4] The Secretary, however, contends that YAF's "assertion of law is not based upon any case from this Circuit, which . . . rejects such a notion." Pl.'s Reply at 4.

Both parties have raised plausible arguments on this point. YAF has pointed to authority from the Eleventh Circuit that indicates that "under Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought." Doe, 175 F.3d at 884. And it is not clear that Am. Chemistry Council actually requires a name-specific identification. To be sure, in that case the D.C. Circuit stated that "an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact." Am. Chemistry Council, 468 F.3d at 820. YAF, however, has alleged that at least one specific member was denied the opportunity to meet with military recruiters at each of the pertinent job fairs; it has simply not identified that specific member by name. In Am.

---

[4] The Secretary correctly points out that this statement from FAIR is arguably dictum. Although FAIR had declined to release its entire membership list (as the government had requested), two law schools did indeed come forward to identify themselves as aggrieved members of FAIR. See FAIR, 291 F. Supp. 2d at 289 ("Even if FAIR were obligated to identify a member to establish associational standing, it has done so. Plaintiffs' Second Amended Complaint names two members of FAIR -- Golden Gate University School of Law . . . and the Faculty of Whittier Law School."). Thus, the Secretary urges the Court not to assign any weight to the pertinent statements of law from FAIR. The Court declines that invitation. To begin with, the district court's decision in FAIR represents only persuasive, and not binding, authority, so whether the disputed holdings are characterized as dicta or otherwise ultimately does not significantly alter their force. Moreover, the authority that the district court relied on -- most notably, the Eleventh Circuit's opinion in Doe -- remains valid law.

Chemistry Council -- unlike here -- the plaintiffs "submitted no affidavits or other forms of evidence" to suggest that any of their constituent members had suffered individual harm. Id. at 819. But in this case, YAF has in fact submitted a declaration that alleges that specific members at UCSC have suffered harm, and even the Secretary appears willing to concede at least that YAF has "suggest[ed] that . . . one student has been denied access." See Def.'s Reply at 5.

On the other hand, there are certain difficulties presented by proceeding with only anonymous student members identified by YAF. There is no way to tell, for instance, whether the anonymous individuals cited in Mr. Youngblood's declaration are still students at UCSC or whether they have since graduated or transferred because at least one year has passed since the last job fair referenced in the declaration. Thus, it is difficult to discern whether the relief requested by YAF would in fact remedy any of those individuals' asserted injuries.[5]

Ultimately, YAF may have shown -- although just barely -- the bare minimum required to demonstrate that one of its members has a cognizable injury-in-fact for associational standing purposes, particularly at the liberal pleading stage. It is not, however, necessary for this Court to decide that question. Even assuming that one of YAF's members does have a sufficient injury-in-fact, YAF has not shown: (1) that such injury was caused by the Secretary's actions; or (2) that the injury will be redressed by the relief it has requested in this lawsuit.

b.    Causation & Redresssability

Where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed" than in the ordinary case to establish standing. Defenders of Wildlife, 504 U.S. at 562 (emphasis in

_____

[5] Indeed, this question would also be relevant to a mootness inquiry.

original).  In this case, "causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction -- and perhaps the response of others as well."  Id.  Two of the "essential elements of standing," therefore, "depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'"  Id. (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989)).  "Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  Id. (quoting Allen v. Wright, 468 U.S. 737, 758 (1984)).  Finally, "[w]here plaintiffs' claim hinges on the failure of government to prevent another party's injurious behavior, the 'fairly traceable' and redressability inquiries appear to merge."  The Freedom Republicans v. FEC, 13 F.3d 412, 418 (D.C. Cir. 1994) (citing Competitive Enterprise Inst. v. NHTSA, 901 F.2d 107, 113 (D.C. Cir. 1990)).[6]

Neither the Secretary nor UCSC are the direct cause of the injuries supposedly incurred by YAF's members.  As noted above, UCSC has an established written policy that provides equal access to military recruiters.  Thus, UCSC stands in a far different position relative to its students than did the Yale Law School when it initially had a non-discrimination policy that barred military recruiters from "school-sponsored recruiting services."  Student Members of SAME v. Rumsfeld, 321 F. Supp. 2d 388, 390 (D. Conn. 2004).[7]  Oddly enough, YAF appears to

---

[6] Such is the case here.  Whether the Secretary's inaction is the "cause" of the continual injury of YAF's members at UCSC turns on whether UCSC would be able or willing to halt the student and faculty protests -- which are the true "cause" of the members' injuries -- in the event that the Secretary took steps to terminate UCSC's federal funding.

[7] Yale Law School's policy has since been suspended so as to conform with the Solomon Amendment.  Student Members of SAME, 312 F. Supp. 2d at 391; see also Pl.'s Sur-Reply at 4

recognize this; it cites to statements by UCSC's public relations officer who stated that "[t]he campus has consistently complied with all requirements of the Solomon Amendment."  See Pl.'s Opp'n at 9 n. 1.  And surely the Secretary has not directly prevented any YAF members from meeting with military recruiters at UCSC.  Instead, it is the student and faculty protests that are the culprit in thwarting the members' access to military recruiters.  Consequently, YAF's theory of causation in this case is necessarily more attenuated: it asserts that if the Secretary terminates UCSC's federal funding, then UCSC -- which YAF insists has "remained idle and tacitly approved of these protests and near riots" -- "will change its behavior" and somehow crack down on the protests, thereby allowing YAF members once again to meet with military recruiters on-campus unimpeded.  See Pl.'s Opp'n at 16.

  That theory of causation does not satisfy the standing requirement.  As a general matter, "Article III [standing] is not present where a plaintiff's injury results from the independent act of a third-party."  Student Members of SAME, 321 F. Supp. 2d at 397.  Although it is true that an injury can be "fairly traceable" to a defendant when that defendant can exercise a "determinative or coercive effect" upon the third-party, see id. (quoting Bennet v. Spear, 520 U.S. 154, 169 (1997)), that is not the case here.  There is no evidence in this case that the protests have been initiated or otherwise supported by UCSC.  Instead, the student and faculty protests that prevent access to military recruiters appear to be solely "the result of the independent action of some third party not before the court."  Defenders of Wildlife, 504 U.S. at 560.

  Moreover, it is unclear how UCSC could "change its behavior," as YAF put it, in a

_____

("Immediately [after the court decision], Yale Law School announced that it would allow military recruiters to participate in its on-campus recruiting programs.").

manner that would suppress the student and faculty protests.    As the Secretary rightly observes, there is "no way of predicting the impact that terminating federal funding to UCSC will have on behavior of students and faculty."  See Def.'s Reply at 6.  There is already evidence that UCSC officials have taken measures to ensure that the protests do not violate student or faculty codes of conduct -- see Pl.'s Mot. at 9 n.1 (UCSC public relations officer stating that "standard campus judicial process was followed to investigate whether students violated the campus code of conduct and to take appropriate disciplinary action") -- and YAF does not suggest what more could be done by UCSC in response to the loss of its federal funding.  Indeed, the Secretary argues with considerable force that because the "students and faculty have allegedly acted contrary to the institution's established written policy permitting equal access to recruiters, the better prediction is to assume that such students and faculty would care little about federal funding and would continue with their actions."  See Def.'s Reply at 6.

Furthermore, notwithstanding YAF's attempt to dismiss the issue as a "red herring," see Pl.'s Sur-reply at 5, there are important First Amendment considerations to take into account here.  Contrary to YAF's belief, those First Amendment concerns do not belong to UCSC, but rather to the student and faculty protesters.  Any action taken by UCSC to curtail non-violent protests could potentially run afoul of the protesters' First Amendment freedoms; after all, UCSC is a public institution subject to the constraints of the First Amendment.  Thus, there are reasons to doubt that the termination of federal funding will actually redress the injury suffered by YAF's members in this case.

Finally, YAF has not adequately demonstrated that UCSC would "change its behavior" even if it could do so.  Put another way, UCSC may opt to accept the loss of its federal funding

rather than attempt to curtail the protest activity that has disturbed military recruiting on-campus. In that instance, too, terminating UCSC's federal funding would not redress YAF's injuries. That was the case in <u>Freedom Republicans</u>, where the D.C. Circuit found that it would require "pure speculation" to conclude that the Republican party would eliminate its contested "bonus delegate system" if the Federal Election Commission cut off public funding for the Republican National Convention.  13 F.3d at 419.  This case would require even more speculation: here, unlike in <u>Freedom Republicans</u>, UCSC maintains no policy of its own that it could change in response to the elimination of federal funding.  Instead, UCSC would be forced to exert some form of coercive influence on third-parties (the protesters) in order to redress YAF's injuries, and that very exercise of coercion may have First Amendment implications.

YAF's claim that speculation "may not even be necessary because a previous Solomon Amendment case has demonstrated already what happens when a university is threatened with a loss of its federal funding," <u>see</u> Pl.'s Sur-reply at 4,  misses the point entirely.  The case that YAF referred to is <u>Burt v. Gates</u>, 502 F.3d 183 (2d Cir. 2007).  There, the Second Circuit upheld the constitutionality of the Solomon Amendment against challenge by several members of the faculty at Yale Law School.  <u>Id.</u> at 192.  In response, YAF insists that "Yale Law School announced that it would allow military recruiters to participate in its on-campus recruiting programs."  Pl.'s Sur-reply at 4.  Based upon that reaction, YAF argues that UCSC would surely respond in kind.  But unlike Yale Law School, UCSC has <u>no</u> written policy of restricting military recruiter access that it could revise; to the contrary, UCSC's written policy already complies with the Solomon Amendment.  Indeed, there is no action that UCSC could take within its own institution to reverse course because the source of the disruption lies not with the school but with the

protesters.

In sum, "YAF's 'unadorned speculation' that threatening to terminate federal funding to UCSC will stop the protests of student and faculty members who are not before the Court 'will not suffice to invoke the federal judicial power.'" Def.'s Reply at 7 (quoting Nat'l Wrestling Coaches Ass'n v. Department of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004)).  Simply put, YAF's theories of causation and redressability are too attenuated to carry YAF's burden to establish standing.  Accordingly, the Court will grant the Secretary's motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court will grant the Secretary's motion to dismiss.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Date: June 12, 2008